# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

JAMES R. FUERST,

       Plaintiff,

    v.                                    Case No. 04-C-295

DAVID A. CLARKE,

       Defendant.

---

## DECISION AND ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT

---

## I.  PROCEDURAL AND FACTUAL BACKGROUND

This action was commenced on February 27, 2004, when the plaintiff, James Fuerst ("Fuerst") filed a complaint in the Milwaukee County Circuit Court, pursuant to 42 U.S.C. § 1983, alleging that his constitutional rights were violated by the defendant, David Clarke ("Clarke" or "the Sheriff"), the Sheriff of Milwaukee County.  Subsequently, on March 24, 2004, the defendant removed this action to the United States District Court for the Eastern District of Wisconsin pursuant to 28 U.S.C. § 1441, on the basis of federal question subject matter jurisdiction.  The plaintiff alleges that the defendant deprived the plaintiff of his First Amendment rights of free speech and free association by denying the plaintiff a promotion based upon the public statements the plaintiff made that were critical of the Sheriff's policies.

Currently pending before the court are the parties' cross motions for summary judgment.  The motions are fully briefed and are ready for resolution.  For the reasons which follow, the defendant's motion for summary judgment is granted, and the plaintiff's motion for summary judgment is denied.

In accordance with the provisions of Civil Local Rule 56.2(a) (E.D. Wis.), the defendant's motion for summary judgment was accompanied by a set of proposed findings of fact. Likewise, the plaintiff's response to the defendant's motions for summary judgment contained responses to the defendant's proposed findings of fact. The plaintiff's motion for summary judgment was also accompanied by a set of proposed findings of fact. Likewise, the defendant's response to the plaintiff's motion for summary judgment contained responses to the plaintiff's proposed findings of fact. A review of the parties' respective proposed findings and the responses thereto reveal that the following are material and (except where noted) undisputed facts that are relevant to the disposition of the cross motions for summary judgment.

Plaintiff James Fuerst is employed as a deputy sheriff in the Milwaukee County Sheriff's Department. (Defendant's Proposed Finding of Fact ("DPFOF") ¶ 1.) Deputy Fuerst was first employed by Milwaukee County as a Deputy Sheriff in 1974. (Plaintiff's Proposed Finding of Fact ("PPFOF") ¶ 4.) After ten years of service with the Sheriff's Department, Deputy Fuerst resigned in June of 1984, and was rehired in August of 2000. (PPFOF ¶ 5.)

Deputy Fuerst had a college degree and had earned credits towards a Master's degree. (PPFOF ¶ 59.)

The defendant, David A. Clarke, Jr., was, at all times pertinent hereto, the Milwaukee County Sheriff and chief administrative officer of the Milwaukee County Sheriff's Department, with offices located at 821 West State Street, Milwaukee, Wisconsin 53233. (PPFOF ¶ 1; DPFOF ¶ 4.) Clarke was initially appointed to the office in March of 2002 and successfully ran for office in September and November of 2002. (DPFOF ¶ 5.) At all times pertinent hereto, Sheriff Clarke carried out the duties of the Milwaukee County Sheriff and acted under color of law. (PPFOF ¶ 3.)

2

As Sheriff and head of the Sheriff's Department, Sheriff Clarke had ultimate control over promoting employees within the Sheriff's Department, including, but not limited to, Deputy Fuerst. (PPFOF ¶ 2.)

The MDSA is a labor organization within the meaning of § 111.70(h), Wis. Stats., with offices located at 821 West State Street, Milwaukee, Wisconsin, 53233. (PPFOF ¶ 14.) The MDSA has, pursuant to the Wisconsin Municipal Employment Relations Act ("MERA"), § 111.70, Stats., et seq., been recognized by Milwaukee County as the exclusive bargaining representative for certain nonsupervisory and supervisory deputies of the Milwaukee County Sheriff's Department. (PPFOF ¶ 15.) The MDSA is a party to the Collective Bargaining Agreement between Milwaukee County and the MDSA. (PPFOF ¶ 16.)

Deputy Fuerst ran for and was elected to the position of president of the Milwaukee Deputy Sheriff's Association ("MDSA"), effective January 1, 2003, and served in that capacity until resigning from that position effective January 1, 2005. (PPFOF ¶ 13; DPFOF ¶ 3.) After January 1, 2003, Deputy Fuerst often spoke on behalf of the MDSA on issues of concern to the MDSA. (PPFOF ¶ 17.)

Before Fuerst was elected MDSA president, Clarke did not know who Fuerst was. (Clarke Dep. at 44, lines 18-22.)

After the Sheriff had been appointed, but while he was seeking election, the MDSA Board approved a "No Confidence Vote" in relation to the Sheriff's pending election. (PPFOF ¶ 10.) Deputy Fuerst was involved in that vote and was in charge of publicizing the results of that vote to the community at large. (PPFOF ¶ 11.) The intention was to bring that vote to the attention of the

3

media in order to prevent Clarke from being elected. (DPFOF ¶ 18.) On September 8, 2002, the MDSA's "No Confidence Vote" was published in the Milwaukee Journal-Sentinel. (PPFOF ¶ 12.)

The Sheriff admitted that Deputy Fuerst had been fighting the Department "every step of the way" since being elected to president of the MDSA. (PPFOF ¶ 71.)

Fuerst was involved in efforts to defeat Clarke in his election campaigns. Fuerst marched in the Labor Day parade in support of Clarke's opponent. Fuerst made several appearances with the opponent and was involved in door-to-door campaigning on his behalf. (DPFOF ¶ 19.)

In March of 2002, the Sheriff attended a meeting of the MDSA. (PPFOF ¶ 7.) Deputy Fuerst averred that, at the meeting, the Sheriff said he would promote individuals according to their ranking on the eligibility list, by "go[ing] right down the list." (Fuerst Aff. ¶ 24.) In his deposition, the Sheriff testified that, at the meeting, he said he "would be inclined to do that, to go in the order that [the names] appear, . . , but I'll look at it." (Clarke Dep. at 49, lines 10-12.) Clarke further testified that he was not familiar with the process, and that it was not the same process that was used at the Milwaukee Police Department, the law enforcement agency that he previously worked for. (Clarke Dep. at 49, lines 3-7, 14-16.)

In the fall of 2002, the Sheriff's Department conducted an examination for the position of Sergeant. (DPFOF ¶ 7.) The Sergeant's examination tested operational knowledge of the Sheriff's department, as well as general supervision principles. (PPFOF ¶ 19.) On January 16, 2003, Milwaukee County generated a listing which provided the raw score and ranking for each of the 105 deputies who took the Sergeant's exam. (PPFOF ¶ 18.)

Sergeants in the Milwaukee County Sheriff's Department serve as first-line supervisors with the primary responsibility for overseeing the deputy sheriffs. They are responsible for instructing and

4

training deputies. They are the line representatives of the Sheriff in terms of his dealings with deputies. Other than a reference to budget involvement, the position description contained in Exhibit 1 (the October 7, 2002 Notice of Examination for the rank of sergeant with the Milwaukee Sheriff's Department) accurately describes the duties of a Sergeant. (DPFOF ¶ 17.)

Sergeants are the people on the command structure who implement "the policies as they come down from the upper levels of the department." (Pl.'s Resp. to DPFOF ¶ 17; Fuerst Dep. at 13, lines 12-18.)

Deputy Fuerst scored second out of the 105 individuals taking the examination, and was ranked second on the Eligible List. (PPFOF ¶ 20; DPFOF ¶ 8.) Deputy Fuerst's raw score was one-half of one percent (0.005%) lower than the Deputy who scored highest on the examination and was ranked first on the Eligible List. (PPFOF ¶ 21.)

In Deputy Fuerst's experience, no deputy having scored as high as he did on the promotional examination had ever been passed over for promotion. (PPFOF ¶ 22.) Clarke notes that Fuerst had been out of law enforcement for approximately 16 years and was only back with the department for a period of 3 years prior to taking the examination and that Fuerst was not directly involved in personnel issues. (Def.'s Resp. to PPFOF ¶ 21.)

On March 15, 2003, Deputy Fuerst submitted a resume and cover letter to the Sheriff, seeking consideration relative to promotion to the rank of Sergeant. (PPFOF ¶ 31.) Fuerst was not interviewed or promoted to the position of Sergeant. (DPFOF ¶ 15.)

At all times material, Kevin Carr served as Inspector for the Milwaukee County Sheriff's Department. Carr was promoted to that position by Clarke in March of 2002. Carr previously served as Deputy Inspector under the previous Sheriff, Leverett Baldwin. (DPFOF ¶ 6.) Inspector Carr is

5

the second highest ranking officer within the Sheriff's Department, second only to the Sheriff himself. (PPFOF ¶ 33.)

Some time between March 15, 2003, and April 1, 2003, Deputy Fuerst and the Business Agent for the MDSA, Gerald Rieder, met with Inspector Kevin Carr of the Milwaukee Sheriff's Department. (PPFOF ¶ 32.) During the meeting, Inspector Carr acknowledged that Deputy Fuerst's resume was "impressive." (PPFOF ¶ 34.)

On March 28, 2003, which was 13 days after Deputy Fuerst submitted his resume and cover letter to Sheriff Clarke, Inspector Carr issued a directive requiring resumes from all deputies on the "Eligible List" by April 4, 2003. (PPFOF ¶ 35; DPFOF 11.)

Milwaukee County Civil Service Rules address the procedure to be followed relative to promotions. (PPFOF ¶ 38.)

The Human Resources Department provided the Sheriff with a list of the top "dozen or so" examinees taken from the Eligible List, who were "certified" to fill the promotional positions. (PPFOF ¶ 51.)

The Sheriff is not required to pick individuals from the list dependent upon where they ranked. (DPFOF ¶ 9.) Fuerst disagrees to the extent that the Sheriff is required to choose deputies from the eligibility list based upon where they are ranked, insofar as the Milwaukee County Civil Service Rules limit the number of names from which he can choose to ten names for one vacancy, and two additional names for each vacancy thereafter. (Pl.'s Resp. to DPFOF ¶ 9.)

The examinees "certified" by Human Resources included Deputy Fuerst, but did not include Deputy Sajdowitz, who ranked 24th on the Eligible List. (PPFOF ¶ 52.) Deputy Sajdowitz was given a temporary appointment to a higher classification. (Def.'s Resp. to PPFOF ¶ 52, 53.) The

6

Sheriff had authority to make temporary sergeant promotions pursuant to the selective service rules. (Def.'s Resp. to PPFOF ¶ 53.)

The Sheriff was directed by an official with the Milwaukee County Human Resources Department that promotions must be made from the names "certified" from the Eligible List. (PPFOF ¶ 53.)

The Sheriff did not want to promote from Human Resources' "certified" list of names. He wanted to "break down the bureaucracy" associated with Civil Service's control over the Sheriff's Department in terms of promotions. (PPFOF ¶ 56.)

On March 7, 2003, the Sheriff promoted the following two individuals to the rank of Sergeant: Deputy Patricia Boehm, who finished first on the exam and ranked first on the Eligible List, and Deputy Melissa Enos, who finished 13th on the exam and ranked 13th on the Eligible List. Deputy Enos had been serving as an Acting Sergeant. (PPFOF ¶ 29; DPFOF ¶ 10.) Only Deputy Enos and Deputy Boehm were promoted off the Human Resources initial list of eligible individuals. (PPFOF ¶ 55.)

On April 2, 2003, Sheriff Clarke promoted Deputy Dennis Konkel, who had scored 14th on the examination and ranked 14th on the Eligible List, to the rank of Sergeant. Deputy Konkol's promotion was described as "permanent" on the order of promotion. (PPFOF ¶ 77; DPFOF ¶ 13.) On April 2, 3003, Sheriff Clarke also promoted Deputy Thomas Meverden, who scored third on the examination and ranked third on the Eligible List, and Deputy Sajdowitz, who scored 24th on the examination and ranked 24th on the Eligible List, to the rank of Sergeant. Both such promotions were described as "temporary" on the order of promotion. (PPFOF ¶ 78; DPFOF ¶ 13.) Although

7

Deputy Sajdowitz ranked 24th on the Eligible List, his name was not on Human Resources' "certified" list of promotional candidates. (PPFOF ¶ 79.)

Prior to promoting those deputies, the Sheriff interviewed Deputy Meverden (who scored third on the examination and ranked third on the Eligible List), Deputy Coleman (who scored fourth on the examination and ranked fourth on the Eligible List), Deputy Parish (who scored fifth on the examination and ranked fifth on the Eligible List), Deputy Worden (who scored tenth on the examination and ranked tenth on the Eligible List), Deputy Enos (who scored 13th on the examination and ranked 13th on the Eligible List), Deputy Konkol (who scored 14th on the examination and ranked 14th on the Eligible List), Deputy Sajdowitz (who scored 24th on the examination, was not on Human Resources initial "certified" Eligible List, and ranked 24th out of all 105 examinees). (PPFOF ¶ 66.)

The promotions of Enos and Konkel and the appointments of Meverden and Sajadowitz to acting positions did not violate Milwaukee Civil Service regulations. (DPFOF ¶ 16.) No resume was required of Deputies Boehm or Enos prior to their having been promoted to the rank of Sergeant. (PPFOF ¶ 36.)

The Sheriff determined who would be interviewed for promotion. (PPFOF ¶ 60.) The Sheriff did not give Deputy Fuerst a chance for an interview before promoting the five Deputies listed above. (PPFOF ¶ 61.) According to Inspector Carr, this was because Fuerst disagreed with the Sheriff's "vision" and "mission," and demonstrated that disagreement by fighting the administration "at every

8

turn on everything [the administration] was trying to do." That "fight" was based on the positions taken by the MDSA, "as embodied by the president who was Deputy Fuerst."[1]

The Sheriff only met with Deputy Fuerst after he requested a meeting, and after the promotions were made of deputies ranking lower on the Eligible List than he. (PPFOF ¶ 63.)

In making his initial promotions to Sergeant, the Sheriff wanted "people who were loyal, came in the door loyal to the vision." In his words, the Sheriff needed Sergeants who demonstrated "a unity of purpose . . . [and] mission." (PPFOF ¶ 72.) Inspector Carr did not believe Deputy Fuerst could be trusted to be loyal to the Sheriff's "vision," considering the various positions taken by Deputy Fuerst on behalf of the MDSA. (PPFOF ¶ 74.)

On March 6, 2003, the Milwaukee Journal Sentinel published an article written by "Spivak and Bice," addressing the Sheriff's proposal to the Milwaukee County Board of Commissioners to eliminate a civil-service position within the Sheriff's Department, and replace it with an individual of the Sheriff's choosing, who would not be subject to the Milwaukee County Civil Service Rules and whose salary would be up to $71,500 per year. (PPFOF ¶ 23.) The March 6, 2003 "Spivak and Bice" article identified Deputy Fuerst as the "Deputy Sheriff's Association President" and stated that "[n]oting that Clarke's name was being tossed about as a potential mayoral candidate, Deputy Sheriff's Association President Jim Fuerst was skeptical about Clarke's latest brainstorm." (PPFOF ¶ 25.) Fuerst was quoted: "Is this going to be an extension of his campaign? We've got a three million dollar deficit and he wants to hire a public relations person. We could certainly find better things to do with $70,000 a year." (DPFOF ¶ 25; PPFOF ¶ 26.) Deputy Fuerst's quoted statement

---

[1] Although Clarke disputes this fact, he has not provided specific citations to evidentiary materials in the record to support that dispute as required by Civil Local Rule 56.2(b)(1). Therefore, the court concludes that this fact is not genuinely in dispute.

9

to "Spivak and Bice" was made in his capacity as President of the MDSA and on behalf of that organization.  (PPFOF ¶ 27.)

Inspector Carr discussed the March 6, 2003 "Spivak and Bice" article with the Sheriff "fairly contemporaneously with its publication."  (PPFOF ¶ 28.)

On April 15, 2003, Deputy Fuerst requested and was granted a "face-to-face" meeting with the Sheriff.  (PPFOF ¶ 80.)  Deputy Fuerst, the Sheriff, and Inspector Carr were present at the meeting.  (PPFOF ¶ 81.)  During the meeting, Deputy Fuerst questioned the Sheriff as to why he was not promoted to the rank of Sergeant, given his ranking of second on the Eligible List and his prior accomplishments.  (PPFOF ¶ 82.)

During the meeting, Deputy Fuerst also questioned why other Deputies who scored lower on the examination and ranked lower on the Eligible List were promoted over him.  (PPFOF ¶ 83.)  The Sheriff stated that he did not feel he could trust Deputy Fuerst, given that he viewed Deputy Fuerst as not being "loyal" to the Sheriff's "vision."  (PPFOF ¶ 84.)

During the meeting the Sheriff provided Deputy Fuerst with a copy of the March 6, 2003 "Spivak and Bice" article.  The copy of the article provided to Deputy Fuerst contained yellow highlighting over that portion of the article where Deputy Fuerst was quoted as being critical of Sheriff Clarke's proposal to eliminate a civil-service position in the Sheriff's Department.  Although Sheriff Clarke could not recall whether the article contained any highlighted portion, he did not deny that he provided a copy of the "Spivak and Bice" article to Deputy Fuerst during that meeting in response to Deputy Fuerst's questions as to why he had been passed over for promotion.  (PPFOF ¶ 85.)

10

The parties dispute the explanation given during the face-to-face meeting. Fuerst states that at no time during the "face-to-face" meeting did the Sheriff advise Deputy Fuerst that his qualifications were inadequate and that at no time did the Sheriff explain that Deputy Fuerst lacked sufficient experience, or was unqualified, to be a Sergeant. The only explanation given was the March 6, 2003 "Spivak and Bice" article. (PPFOF ¶ 87.) Clarke disagrees that the only explanation given was the "Spivak and Bice" article. The Sheriff agrees that he did not advise Fuerst that his qualifications were inadequate, but states that he also did not directly respond to Fuerst's request for an explanation as to why he was not selected. (Fuerst Dep. at 59, lines 13-19; Def.'s Resp. to PPFOF ¶ 87). The Sheriff states that he made no oral reference to the Spivak and Bice column during their meeting. (Fuerst Dep. at 62, lines 11-25; at 63, lines 23-25; at 64, lines 1-4; Def.'s Resp. to PPFOF ¶ 87.)

It was clear to Deputy Fuerst from presentation of the highlighted copy of the March 6, 2003 "Spivak and Bice" article that the Sheriff refused to promote him to Sergeant because he had spoken out against him to the media.[2] (PPFOF ¶ 88.)

Had he been promoted, Deputy Fuerst would not have allowed his duties as MDSA President to interfere with his duties as Sergeant. (PPFOF ¶ 75). Clarke disagrees. Fuerst found a number of Clarke's policies to be offensive to deputy sheriffs. (Def.'s Resp. to PPFOF at ¶ 75; DPFOF ¶ 21.) And, Fuerst would not have resigned his position as president of the labor union if he had been promoted to Sergeant. (Def.'s Resp. to PPFOF at ¶ 75; DPFOF ¶ 20.)

---

[2] Because Clarke did not respond to this proposed finding of fact, the court concludes, pursuant to Local Rule 56.2(e), that this fact is not genuinely in dispute.

11

If Fuerst had been selected as sergeant, in his capacity as MDSA president, he would have opposed policies maintained and formulated by Clarke that the MDSA did not like, but he would have upheld the policies that the MDSA felt were good for the department. (Fuerst Dep. at 26, lines 5-11.)

Prior to June 15, 2003, Deputy Fuerst was questioned by "Spivak and Bice" as to the Sheriff having promoted other Deputies to the rank of Sergeant over Deputy Fuerst. (PPFOF ¶ 90.)

On June 14, 2003, "Spivak and Bice" authorized a column addressing the fact that Fuerst was not promoted to Sergeant. Fuerst was quoted as saying, "there's no doubt I've been denied a promotion at this time. I have to suspect it is because of my activity in the Union." (DPFOF ¶ 26.)

On June 15, 2003, the Milwaukee Journal Sentinel published another article authored by "Spivak and Bice," which addressed Sheriff Clarke's having promoted other deputies to Sergeant and refusing to promote Deputy Fuerst. (PPFOF ¶ 91.)

The June 15, 2003 "Spivak & Bice" article stated that "[b]reaking with tradition, Sheriff Clarke recently promoted five cops of his own choosing, pretty much disregarding the scores on the promotional exam. The first-term sheriff dipped as low as the 24th finisher on the test to fill the sergeants' slot." (PPFOF ¶ 92.)

The June 15, 2003 article then stated that Deputy Fuerst had been "skipped over" despite having finished second on the promotional examination, and identified Deputy Fuerst as "head of the Milwaukee Deputy Sheriff's Association and a critic of the sheriff." (PPFOF ¶ 93.)

The June 15, 2003 "Spivak and Bice" article then asserted that the Sheriff did not deny that Deputy Fuerst's critical comments published in the March 6, 2003 "Spivak and Bice" article affected his chances of promotion. At deposition, the Sheriff did not recall whether he was specifically asked

the question as to whether Deputy Fuerst's comments may have cost him the promotion. (PPFOF ¶ 94.)

The Sheriff claims that he was not looking for "yes men" in his Sergeants. (PPFOF ¶ 96.)

On June 8, 2004, Fuerst made a statement that appeared in the Milwaukee Journal Sentinel. "Clarke was piling on to score political points and often ignored punishment recommendations by his top command staff." That was the view of the Union and of Fuerst personally. Fuerst also stated in reference to Clarke in the same article, "he shoots from the hip," and that his "heavy handed discipline has hurt morale." Both statements represented Fuerst's personal view as well as his view as union president. (DPFOF ¶ 24.)

On June 11, 2004, Fuerst was quoted in an article in the Milwaukee Journal Sentinel as saying "Inmates know they have a sheriff who has their ear" in reference to inmates in the custody of Milwaukee County. (DPFOF ¶ 23.)

## II. SUMMARY JUDGMENT STANDARD

A district court must grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

The purpose of summary judgment is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)) (quoting advisory committee's note to 1963 amendment of Fed. R. Civ. P. 56(e)). "Summary Judgment is not appropriate 'if the evidence is such that a reasonable jury could

13

return a verdict for the nonmoving party'" *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A party opposing a properly supported summary judgment motion "may not rest upon the mere allegations or denials of the adverse party's pleading" but rather must introduce affidavits or other evidence to "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e); *see also Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir. 2001). To state it differently, "[a] party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *EEOC v. Sears, Roebuck & Co.,* 233 F.3d 432, 437 (7th Cir. 2000) (quoting *Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997)).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003) (quoting *Anderson,* 477 U.S. at 255). "'In the light most favorable' simply means that summary judgment is not appropriate if the court must make 'a choice of inferences.'" *Draghi v. County of Cook*, 184 F.3d 689, 691 (7th Cir. 1999) (quoting *Smith*, 129 F.3d at 425). "The evidence must create more than 'some metaphysical doubt as to the material facts.'" *Albiero v. City of Kankakee*, 246 F.3d 927, 932 (7th Cir. 2001) (quoting *Johnson v. University of Wisconsin-Eau Claire*, 70 F.3d 469, 477

14

(7th Cir. 1995)).  A mere scintilla of evidence in support of the nonmovant's position is insufficient. *Id.* (citing *Anderson*, 477 U.S. at 252).

Thus, "the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex*, 477 U.S. at 322.

### III.  DISCUSSION

Fuerst moves for summary judgment arguing that Clarke's failure to promote him, based upon public statements he made that were critical of the Sheriff's policies, violated his First Amendment rights.  Clarke also moves for summary judgment arguing that because the position of sergeant is a policymaking position, the Sheriff was free to consider public statements critical of his policies or positions when determining whom to promote to the position of sergeant.

Generally, a government may not "deny a benefit on a basis that infringes constitutionally protected interests—especially, [the] interest in freedom of speech.  For if the government could deny a benefit to a person because of his constitutionally protected speech or associations, his exercise of those freedoms would in effect be penalized and inhibited." *Perry v. Sindelman*, 408 U.S. 593, 597 (1972).  Thus, it is well-established that the government "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression." *Connick v. Myers*, 461 U.S. 138, 142 (1983).  Yet, the government "has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568 (1968).  Accordingly, the court's task, as defined in *Pickering*, is to seek "a balance between the

15

interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Id.* at 568.

When considering a First Amendment retaliation claim, the court typically applies the *Pickering* balancing test. Under this burden-shifting test, the plaintiff initially has the burden to show by a preponderance of the evidence that he engaged in constitutionally protected activity, i.e. the plaintiff must prove that his speech involved a matter of public concern, and "that this conduct was a 'substantial factor' or . . . a 'motivating factor'" in the adverse employment decision. *Mt. Healthy*, 429 U.S. 274, 287 (1977); *Gustafson v. Jones*, 290 F.3d 895, 906 (7th Cir. 2002). If the plaintiff succeeds, the burden shifts to the defendant to show "by a preponderance of the evidence that [he] would have [either] reached the same decision . . . even in the absence of the protected conduct," or that the government's interest in effectively and efficiently providing government services outweighs the plaintiff's First Amendment interests. *Mt. Healthy City School Dist. Bd. of Educ.*, 429 U.S. at 287; *Gustafson*, 290 F.3d at 906.

Subsequent to its decision in *Pickering*, however, the Supreme Court carved out a political patronage exception to the general prohibition against denying benefits based on a public employee's exercise of his or her First Amendment rights. *Elrod v. Burns*, 427 U.S. 347, 367-68 (1976). In *Elrod*, a plurality of the Court held that the dismissal of nonpolicymaking public employees based upon their partisan affiliation violated the First Amendment. 427 U.S. at 368. At the same time, the Court recognized that "the need for political loyalty of employees" may occasionally justify the use of patronage, and thus provided a limited exception to its ban on patronage dismissals for employees holding "policymaking positions." *Id.* at 367. This exception was necessary in order to prevent

16

"representative government [from being] undercut by tactics [that obstruct] the implementation of policies of the new administration, policies presumably sanctioned by the electorate." *Id.* at 367. What constitutes a "policymaking position," however, was not clearly defined by the Court; the Court simply instructed the lower courts to examine the "nature of the responsibilities" of the position at issue and "whether the employee acts as an adviser or formulates plans for the implementation of broad goals" to determine whether the position is a policymaking position. *Id.*

Although frequently referred to as the "policymaker" exception,[3] in *Branti v. Finkel*, 445 U.S. 507, 158, (1980), the Court explained that to determine whether a position is exempted under *Elrod-Branti*, reliance upon mere labels will not suffice. Instead, the court must engage in a functional inquiry as to whether "party affiliation is an appropriate requirement for the effective performance of the public office involved." *Branti*, 445 U.S. at 518. Moreover, in *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 75 (1990), the Supreme Court extended First Amendment protection to "promotions, transfers, and recalls after layoffs based on political affiliation or support." Thus, the *Elrod-Branti* exception to the ban on patronage dismissals was also extended to promotions based upon political affiliation or support.

In light of the foregoing, in a First Amendment retaliation case such as this, there are potentially two separate inquiries to consider: the *Pickering* balancing test and the *Elrod-Branti* policymaking position exception to that test. This court will engage in the latter inquiry first. This is because, if the *Elrod-Branti* policymaking position exception is applicable, then the Sheriff's

_____

[3] Because the majority of positions that qualify for the exception can be characterized as "policymaking" I will use this term as a shorthand reference for positions that have been found to fall within the exception. *See Pleva v. Norquist*, 195 F.3d 905, 912 n.3 (1999).

failure to promote Fuerst, based upon the critical statements Fuerst made, would not have violated the First Amendment.

Thus, this court must first determine whether the position of sergeant is a policymaking position, i.e. whether "party affiliation is an appropriate requirement for the effective performance of [a sergeant in the Milwaukee County Sheriff's office]." *Branti*, 445 U.S. at 518. The Seventh Circuit has interpreted the Supreme Court's definition of a policymaking position to include positions in which "the individual authorizes, either directly or indirectly, meaningful input into government decisionmaking on issues where there is room for principled disagreement on goals or their implementation." *Heideman v. Wirsing*, 7 F.3d 659, 663 (quoting *Nekolny v. Painter*, 653 F.2d 1164, 1170 (7th Cir. 1981). Consequently, the inquiry becomes whether a sergeant in the Milwaukee County Sheriff's Department has "'meaningful input' into either making decisions or implementing them." *Id.*

Although the question of whether a position falls within the *Elrod-Branti* exception is a factual one typically left for the jury, when the duties and responsibilities of a particular position are clearly established, the court may make the determination that a particular position is, as a matter of law, a policymaking position. *See Pleva*, 195 F.3d at 912. The Sheriff seems to argue that Seventh Circuit case law holding that deputy sheriffs are policymakers will summarily dispose of the issue as to whether a sergeant is a policymaker. While that case law is instructive, this court must still engage in a particularized inquiry into the position of sergeant in the Milwaukee County Sheriff's office, as the Seventh Circuit has also held that unless the political nature of the position is obvious, the court must engage in a particularized inquiry. *See Kolman v. Sheahan*, 31 F.3d 429, 432 (7th Cir. 1994) (holding that *Upton* [and its progeny does] not create a *per se* rule that anyone who achieves

18

the title of Chief Deputy necessarily inhabits a decisionmaking job").  Moreover, this court must only look to "the powers inherent in a given office, as opposed to the functions performed by a particular occupant of that office" when determining whether the position is a policymaking one.  *Pleva*, 195 F.3d at 913 (quoting *Tomczak v. City of Chicago*, 765 F.2d 633, 640 (7th Cir. 1985)).

In the Seventh Circuit, there is considerable precedent regarding whether deputy sheriffs are policymakers.  Beginning with *Upton*, the Seventh Circuit has held that it is constitutionally permissible for a sheriff to use political considerations in determining who will serve as a deputy sheriff.[4]  *Upton v. Thompson*, 930 F.2d 1209, 1218 (7th Cir. 1991).  In determining whether a deputy sheriff was a policymaker, the Seventh Circuit analogized the deputy sheriff position to that of an assistant prosecutor or a deputy city commissioner, both of which had been held to be policymaking positions.  *Id.* at 1215 (citing *Livas v. Petka*, 711 F.2d 798 (7th Cir. 1983) and *Tomcczak v. City of Chicago*, 765 F.2d 633 (7th Cir. 1985)).  The Seventh Circuit noted that:

> A deputy sheriff, in implementing the Sheriff's basic policy, will "make some decisions that will actually create policy." . . . [D]eputies on patrol or other assignment frequently work autonomously, giving them wide latitude and discretion in the performance of their duties and in the implementation of department goals. In order to promote public confidence in law enforcement, the Sheriff depends on his deputies to publicly project his competence and the competence of the office.

---

[4] Although deputy sheriffs have been held to be "policymakers" under the *Elrod-Branti* exception to the ban on patronage dismissals in the Seventh Circuit, such is not the case in other circuits.  *See e.g.*, *Hall v. Tollett*, 128 F.3d 418 (6th Cir. 1997) (holding that deputy sheriffs are nonpolicymaking employees and thus, do not fall within the *Elrod-Branti* exception); *Burns v. County of Cambria*, 971 F.2d 1015 (3d Cir. 1992); *Dickeson v. Quarberg*, 844 F.2d 1435 (10th Cir. 1988) (same).  *But see Jenkins v. Medford*, 119 F.3d 1156 (4th Cir. 1997), *cert. denied*, 522 U.S. 1090 (1998) (holding that deputy sheriffs are policymakers); *Terry v. Cook*, 866 F.2d 373 (11th Cir. 1989) (same).

19

*Id.* (quoting *Livas*, 711 F.2d 801). Relying upon its finding that deputy sheriffs "operate with a sufficient level of autonomy and discretionary authority," the Seventh Circuit held that a deputy sheriff is a policymaker and thus, subject to the *Elrod-Branti* exception. *Id.* at 1218.

In *Heideman v. Wirsing*, 7 F.3d 659 (7th Cir. 1993), the Seventh Circuit applied *Upton* to the dismissal of a Wisconsin deputy sheriff. In *Heideman*, the plaintiff, a deputy sheriff, had campaigned for another deputy sheriff who was challenging the incumbent sheriff in an upcoming election, and was also involved in an argument on the eve of the election regarding the two candidates for sheriff. *Id.* at 660. After the incumbent sheriff was re-elected, the sheriff investigated the argument that took place, an investigation which culminated in the deputy sheriff's dismissal. *Id.* at 661. The Seventh Circuit held that under the "broad reach" of *Upton*, the deputy's dismissal was simply another instance of a sheriff using political considerations to determine who would serve under him as deputy. *Id.* at 664. As explained in *Heideman*, the policymaker exception to the First Amendment's ban on adverse employment action based upon patronage "embrace[s] the notion that retaliation in response to political beliefs and political associations . . . may be warranted if the free expression poses a threat to the efficient conduct of a public office because the [employee's] position requires political loyalty." *Id.* at 662.

Thus, the question to be addressed is whether the "duties and responsibilities" of the position of sergeant in the Milwaukee County Sheriff's Department differ from the duties and responsibilities of the above-referenced deputy sheriff positions such that it falls outside the *Elrod-Branti* exception. *See Flenner v. Sheahan*, 107 F.3d 459, 464 (7th Cir. 1997) (stating that the Seventh Circuit follows the functional approach, "which focuses on the duties and responsibilities of a particular office").

20

According to the October 7, 2002 Notice of Examination for the rank of sergeant with the Milwaukee Sheriff's Department, the following constitute some of the duties of a sergeant:

> Under direction, to lead sworn and civilian staff in fulfilling the mission of the Milwaukee County Sheriff's Office . . . to assign, instruct, and train Deputy Sheriffs in the performance of their duties; to coordinate and *implement* inservice training . . . to perform law enforcement functions including effecting arrests, investigating crimes . . . to *formulate and implement* ideas for improving the efficiency of the assigned bureau and/or shift; to assist with budget preparation and monitoring; to prepare and give lectures at schools and civic organizations; to act as a *liaison* between the Sheriff's Office and other county agencies. (Aff. Jonathan Cermele, Ex. A) (emphasis added).

The following are some of the skills and abilities required to be a sergeant in the Milwaukee County Sheriff's Department: "supervisory skills . . . decision making skills, analytical skills; leadership ability . . . ability to *formulate and implement* ideas; [and the] ability to *create and develop alternative policies*." (Aff. Jonathan Cermele, Ex. A) (emphasis added). Further, this job description, provided in the October 7, 2002 Notice of Examination for the rank of sergeant, is reliable. Fuerst himself testified that the duties enumerated on the October 7, 2002 Notice of Examination for the rank of sergeant "fairly described the responsibilities of a sergeant in the Milwaukee County Sheriff's Department." (Fuerst Dep. at 11, lines 1-12.) Moreover, Fuerst himself testified that sergeants in the department are the ones who implement the policies as they come down from the sheriff. *Id.* at 13, lines 12-18.) Fuerst also testified that when a policy is formulated in the department, the policy is communicated to the sergeants and the sergeants are the ones who implement that policy with regard to the deputy sheriffs. *Id.*

Nevertheless, Fuerst argues that sergeants are not policymakers in the Milwaukee County Sheriff's Department because it would be a "practical impossibility for forty-three (43) sergeants and five hundred ninety-two (592) Deputies . . . to have any meaningful input into creation or

21

implementation of the Sheriff's policies." (Pl.'s Br. at 11). Yet, the number of sergeants in the department or the overall size of the department, although instructive in determining the overall command structure of the department, is not particularly relevant to the inquiry as to whether the sergeant has meaningful input into the creation or implementation of the Sheriff's policies. *See Snyder v. Blagojevich*, 332 F.Supp.2d 1132, 1139 n.6 (N.D. Ill. 2004), *aff'd sub. nom. Riley v. Blagojevich*, — F.3d —, No. 04-3085, 2005 WL 2319150 (7th Cir. Sept. 23, 2005) (stating that "nothing in the political patronage jurisprudence suggests that considering the number of employees who hold a position with a given title in a multibranch organization is part of the *Elrod-Branti* inquiry"). *But see Ruffino v. Sheahan*, 218 F.3d 697, 700 (7th Cir. 2000) (noting in dicta that "it would be a remarkable extension of the policymaker line of cases to hold that the hundreds of deputy sheriffs in Cook County are all policymakers"). Nor do I find persuasive Fuerst's argument that because the Milwaukee County Sheriff's Department's manual specifically defines the duties and responsibilities of sergeants (and that list is devoid of any reference to "implementing policy"), the position of sergeant must be considered merely ministerial.

In the end, although Fuerst argues that sergeants in the Milwaukee County Sheriff's Department are not policymakers, this court finds that, in light of the duties and responsibilities given to sergeants in the department, the sergeant position has substantially the same characteristics as the deputy sheriff positions that the Seventh Circuit has previously considered to be policymaking positions. *See e.g.*, *Upton*, 930 F.2d at 1215; *Heideman*, 7 F.3d at 664. As in *Upton* and *Heideman*, sergeants work autonomously, and operate at least with some discretion when performing their duties. When sergeants are training the deputy sheriffs, effecting arrests and investigating crimes, or acting as liaisons between the department and other agencies, there is plenty of room for

22

"principled disagreement" regarding the enforcement of the law or departmental policy, likely just as much as there is for a deputy sheriff. *Heideman*, 7 F.3d at 663 (quoting *Nekolny*, 653 F.2d at 1170). Thus, this court finds that the position of sergeant in the Milwaukee County Sheriff's Department is not merely a ministerial position. Moreover, because this court finds that sergeants have "meaningful input" into the implementation of department policy, they are deemed to be "policymakers."

Notwithstanding this court's finding that the position of sergeant in the Milwaukee County Sheriff's Department is a policymaking position, Fuerst also argues that the *Elrod-Branti* exception still does not apply because (1) the Sheriff's decision was not based upon Fuerst's political affiliation, (2) the Sheriff's decision was not directed toward the efficient and effective operation of the Department, and (3) Fuerst's speech was unrelated to his duties as deputy sheriff or his potential duties as sergeant. This court will address each argument in turn.

Primarily, Fuerst argues that the *Elrod-Branti* "patronage" exception does not apply because the Sheriff's decision was not based upon Fuerst's political affiliation. (Pl.'s Br. in Opp. to Def's Mot. ("Pl.'s Br.") at 17.) To be sure, although all of the aforementioned cases involved adverse employment action based upon political affiliation, the Seventh Circuit has nevertheless extended the *Elrod-Branti* exception to cover adverse employment actions based upon political expression. *See Wilbur v. Mahan*, 3 F.3d 214 (7th Cir. 1993). In *Wilbur*, the Seventh Circuit held that the policymaking exception protected a sheriff's termination of a deputy sheriff who had recently announced running against the sheriff in the upcoming election. *Id.* at 217-18. Because the *Elrod-Branti* exception is based upon the need of a public employer to trust "the occupants of the policymaking positions to carry out his policies with fidelity and diligence," the court held that the

23

First Amendment does not "require a public official to hire, or retain in a confidential or policymaking job, persons who are not his political friends and may be his political enemies." *Id.*

Additionally, the Seventh Circuit has held that the policymaking exception also applies when the adverse employment action is based upon an employee's public challenging of his or her supervisor's policy positions. *See Warzon v. Drew*, 60 F.3d 1234 (7th Cir. 1995). Relying upon the government's interests in efficiency, the Seventh Circuit has held that a public employer can punish policymaking employees who disagree with it regarding job-related policies. *Id.* at 1239; *see also Vargas-Harrison v. Racine Unified School Dist.*, 272 F.3d 964, 973 (7th Cir. 2001) ("[T]he policy-maker analysis applies to situations where a policy-making employee engages in speech critical of his superiors' work-related policies."). In *Warzon*, the Seventh Circuit reasoned that disagreement on job-related policy issues may cause the same type of disloyalty and lack of shared political mission that inconsistent political viewpoints may cause. *Id.*

Thus, under *Elrod-Branti*, as interpreted by the Seventh Circuit, if a policymaking employee makes public statements that are overtly critical of the employer's policy positions, the employer may take adverse employment action based upon the policymaking employee's speech and not run afoul of the First Amendment. Such is the case before the court. Fuerst argues, and Clarke concedes, that a "motivating factor" in the decision not to promote Fuerst to sergeant was Fuerst's "speech and political activities." (Def's Mot. for Summ. J. at 1). Although the defendant concedes that Clarke's decision was based upon *political* activities, a review of the record reveals that Clarke's decision not to promote Fuerst was likely not based upon Fuerst's previous political activities. Rather, Clarke's decision was most likely based upon Fuerst's critical statements regarding Clarke's policy proposal to eliminate a civil service position and hire a private public relations person. *See* DPFOF ¶ 25,

24

PPFOF ¶ 26, and PPFOF ¶ 85. And, perhaps, Clarke's decision was based upon the *inference* that because Fuerst was president of the union, he did not back the Sheriff politically. *See* Pl.'s Br. at 17 (stating that "the MDSA board approved a "No Confidence Vote" in relation to the Sheriff's pending election" and that "Fuerst was involved in that vote," but that "[p]rior to being elected as MDSA President [in January of 2003], the Sheriff had no idea who Deputy Fuerst was"). These motivations, although not based upon overt political expression or affiliation, fall under the *Elrod-Branti* exception as interpreted by the Seventh Circuit, if the employee is a "policymaker."

Further, although Fuerst argues that his statements were not related to the duties of sergeant or deputy sheriff, Fuerst's statements most certainly concerned "job-related policies," and Fuerst's "substantive policy viewpoints." Therefore, the *Elrod-Branti* exception does apply. *See Bonds v. Milwaukee County*, 207 F.3d at 979 (stating that "[t]he policymaking exception does not apply . . . when the speech at issue does not implicate the employee's politics or substantive policy viewpoints"). The Seventh Circuit has held that "the First Amendment does not prohibit the discharge of a policy-making employee when that individual has engaged in speech on a matter of public concern in a manner that is critical of superiors or their stated policies." *Vargas-Harrison*, 272 F.3d at 971 (citing *Warzon*, 60 F.3d at 1239, and *Wilbur*, 3 F.3d at 219). In *Vargas-Harrison*, the Seventh Circuit held that the plaintiff's public criticism of her employer's policy proposal placed her "in square opposition to the stated goals and policies" of her employer, and therefore, because she was a policymaking employee, the First Amendment did not protect her against discharge based upon her opposition to her employer's policy proposal. *Id.* at 974; *see also id.* at 973 ("When the policy-maker's speech creates a conflict with the policy stance of his superiors, the effects on government are 'acute.'") (quoting *Warzon*, 60 F.3d at 1239). Likewise, Fuerst's public criticism

25

of Clarke's policy proposal placed him "in square opposition to the stated goals and policies" of the Sheriff, and therefore, as a policymaking employee, the First Amendment did not protect him against Clarke's failure to promote him to sergeant. *Id.* at 974.

Additionally, Fuerst argues that, notwithstanding the court's finding that a sergeant is a policymaker, the "patronage" exception does not apply because Clarke has not demonstrated that his failure to promote Fuerst was directed toward the efficient and effective operation of his department. (Pl.'s Br. at 15). The Sheriff, however, is not required to prove that the adverse employment action was directed toward the efficient and effective operation of the government; rather, that motivation is presumed. *See Wallace v. Benware*, 67 F.3d 655, 662 (7th Cir. 1995) ("[T]he dismissal or demotion of a deputy who challenged the sheriff in an election withstands a First Amendment challenge only because we presume that the sheriff's action is directed toward the efficient and effective operation of his public office.").

In a related argument, Fuerst argues that this case is similar to *Wallace v. Benware*. However, the facts in *Wallace* are easily distinguishable. In *Wallace*, the sheriff had engaged in a pattern of retaliatory harassment against a deputy sheriff because the deputy had announced that he would run against the sheriff in the upcoming election. *Id.* at 657. The Seventh Circuit held that the sheriff's actions did not fall within the *Elrod-Branti* exception because "it would be illogical to apply the [presumption that the government's action was directed toward the efficient and effective functioning of the government] to harassment designed specifically to hinder or disrupt a deputy in the performance of his duties." *Id.* at 662. Because Clarke did not engage in a pattern of harassment, but rather, simply failed to promote Fuerst to the position of sergeant, the presumption that his

Case 2:04-cv-00295-WEC   Filed 09/28/05   Page 26 of 28   Document 45

decision was directed toward the efficient and effective functioning of the sheriff's department applies.

Although Clarke's failure to promote Fuerst to the position of sergeant may have violated the terms of a collective bargaining agreement, civil service rules, or even substantive Wisconsin state law,[5] Clarke's failure to promote Fuerst to the position of sergeant was permissible under the First Amendment. Fuerst was seeking the position of sergeant in the Milwaukee County Sheriff's Department, a policymaking position, and had publicly advocated positions in conflict with his superior's job-related policy viewpoints. Therefore, Clarke's failure to promote Fuerst to the position of sergeant based upon his public opposition to Clarke's proposed policies did not violate Fuerst's First Amendment rights.

Finally, Fuerst argues that the Sheriff deprived him of his First Amendment right to freedom of association by failing to promote him to the position of sergeant based upon the critical statements he made, as MDSA president, regarding the Sheriff's policies. Free speech claims and free assembly claims are evaluated under the same analysis. *See Kuchenreuther v. City of Milwaukee*, 221 F.3d 967, 972 n.16 (7th Cir. 2000). Thus, for all of the aforementioned reasons, Clarke's failure to promote Fuerst to the position of sergeant based upon his public opposition to Clarke's proposed policies did not violate his First Amendment right to freedom of association.

---

[5] Fuerst argues that sections 164.015 and 164.03 of the Wisconsin Statutes create a liberty interest for Wisconsin law enforcement officers to freely engage in political affiliation without fear of adverse employment consequences. (Pl.'s Br. at 1.) However, Fuerst did not bring any claims based upon those statutes, or Wisconsin law for that matter, before this court. Thus, those arguments have not been addressed.

In conclusion, and for all of the foregoing reasons, the defendant's motion for summary judgment is granted, the plaintiff's motion for summary judgment is denied, and this action is dismissed.

**NOW THEREFORE IT IS ORDERED** that the defendant's motion for summary judgment be and hereby is **GRANTED**;

**IT IS FURTHER ORDERED** that the plaintiff's motion for summary judgment be and hereby is **DENIED**;

**IT IS FURTHER ORDERED** that this action be and hereby is **DISMISSED**;

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment accordingly.

**SO ORDERED** this  28th  day of September 2005, at Milwaukee, Wisconsin.


/s/ William E. Callahan, Jr.
WILLIAM E. CALLAHAN, JR.
United States Magistrate Judge